**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **REDDICK SAYE MILLER PARTNERSHIP *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 3:25-cv-01154** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **COVIDIEN LP,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

The plaintiffs in this lawsuit are the "Reddick Saye Miller Partnership, also known as Reddick Saye Consultants"; Kimberly Clark, as the Executor of the Estate of Eddie Joe Reddick; William Jeffrey Saye, as the Executor of the Estate of William B. Saye; and Lindsay M. Francis and Maggie B. Browney, as the Co-Trustees of the Wayne D. Miller Revocable Living Trust Dated May 21, 2013 ("Miller Trust"). (Compl., Doc. No. 1.) The defendant is Covidien LP ("Covidien"). The Complaint seeks a judicial declaration of the plaintiffs' rights under a Royalty Agreement ("Agreement") executed in 1991 by Dexide, Inc., Covidien's predecessor in interest, and William B. Saye, MD and Eddie Joe Reddick, MD, as "General Partners" of the partnership identified in the Agreement as "Reddick-Saye Consultants." (*See* Doc. No. 1-1.)

Now before the court is Covidien's Motion for Judgment on the Pleadings (Doc. No. 30) which, for the reasons set forth herein, will be denied.

## I. LEGAL STANDARD – RULE 12(c)

The standard of review applicable to a motion for judgment on the pleadings under Rule 12(c) is the same as that for a motion under Rule 12(b)(6). *Moore v. Hiram Twp.*, 988 F.3d 355,

357 (6th Cir. 2021); *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 252 (6th Cir. 2020). Thus, "[f]or purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Moore*, 988 F.3d at 357 (quoting *Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008)).

Generally, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). At the same time, however, it has long been the rule that a court may consider not only the complaint and exhibits attached to it, but also exhibits attached to a defendant's motion to dismiss, "so long as they are referred to in the Complaint and are central to the claims contained therein." *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 694 (6th Cir. 2018) (citation omitted). A court may also consider public records without converting a Rule 12(b)(6) motion into a Rule 56 motion. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) (citation omitted).

## II. FACTS AND PROCEDURAL HISTORY

This is a state law contract dispute over which the court has diversity jurisdiction. The Royalty Agreement ("Agreement") at issue was executed, effective September 16, 1991, by Dexide, Inc. ("Dexide") and by William Saye ("Dr. Saye") and Eddie Joe Reddick ("Dr. Reddick"), as General Partners of Reddick-Saye Consultants (referred to in the Agreement as "Researcher"). (Doc. No. 1-1, Agreement.) The Agreement pertains to a medical product (the "Product") designed by the "Researcher" and provides for royalties to be paid to the Researcher by Dexide, in the event Dexide successfully marketed the Product. (*Id.* ¶¶ 1–2.) The Agreement is to terminate only "at such time that the Product is no longer marketed by DEXIDE or by a licensee of DEXIDE." (*Id.* ¶ 3.)

Of particular relevance to this lawsuit is the Agreement's provision regarding "Assignment of Interests." That paragraph states in full:

> 10. Assignment of Interests – Neither this Agreement nor any right or obligation arising hereunder may be assigned by RESEARCHER in whole or in part, without the prior written consent of DEXIDE, which may be withheld in the absolute discretion of DEXIDE[.] DEXIDE may, upon written notice to RESEARCHER, assign this Agreement or any part hereof without the prior written consent of RESEARCHER. This Agreement shall be binding upon any assignor and, subject to the restrictions on assignment herein set forth, inure to the benefit of the successors and assigns of each of the parties hereto.

(*Id.* ¶ 10.) It is undisputed that Covidien is Dexide's successor in interest or assignee and has stepped into Dexide's shoes under the Agreement.

According to the Complaint, the team of researchers at Reddick-Saye Consultants who developed the Product that is the subject of the Agreement consisted of Dr. Reddick, Dr. Saye, and Wayne Miller. (Compl. ¶ 22.) The address provided for Researcher in the Agreement was Dr. Reddick's home address at the time the Agreement was executed. (*Id.* ¶ 25.) Reddick-Saye Consultants did not have a written partnership agreement, and the partnership was a general partnership under Tennessee law. (*Id.* ¶ 35.)

It is unclear when, exactly, Dexide began making royalty payments to Reddick-Saye Consultants under the Agreement, but the plaintiffs attached as exhibits to the Complaint cover letters showing that such payments began no later than early 2000, for royalties related to sales of the Product during the third and fourth quarters of 1999. (*See* Doc. No. 1-2.) Beginning with the payment in February 2001 for sales during the fourth quarter of 2000 and continuing, according to the Complaint, through 2012, Tyco Healthcare, as the then-successor to Dexide, began sending cover letters and checks to Dr. Reddick individually. (*See* Doc. No. 1-3 at 2–4; *see also* Compl. ¶¶ 27–28.) Tyco Healthcare also issued annual Form 1099s to Dr. Reddick individually during that time frame, reflecting those payments to him individually. (Compl. ¶ 29.) Covidien, as Tyco

Healthcare's successor, continued this practice from, apparently, August 2012 through mid-2024. (*See* Doc. No. 1-3 at 5; *see also* Compl. ¶ 27.)

While the payments were made to Dr. Reddick individually, Dr. Reddick distributed shares of the royalties to Dr. Saye and Mr. Miller. (Compl. ¶ 30.) After Mr. Miller died in February 2018, his share of the royalties began to be distributed to the Miller Trust, in accordance with Mr. Miller's estate plan. (*Id.* ¶¶ 31–32.) After Dr. Reddick died in June 2020, his share of the royalties began to be distributed to the Eddie Joe Reddick Family Trust ("Reddick Trust") in accordance with Dr. Reddick's estate plan. (*Id.* ¶¶ 33–34.)

In September 2020, the then-surviving partner of Reddick-Saye Consultants, Dr. William Saye, entered into a written partnership agreement with the Reddick Trust and the Miller Trust to formalize the arrangement to which the parties had informally adhered for the preceding two decades: that is, that the royalties would continue to be shared among the members of the Reddick-Saye Consultants, and, after the death of any member, that member's share would be distributed to his successors. This partnership agreement, the Reddick Saye Miller Partnership Agreement, formed a general partnership. (*Id.* ¶ 36; *see also* Doc. No. 29-1.[1]) The Reddick Saye Miller ("RSM") Partnership originally consisted of Dr. Saye and the successors of Dr. Reddick and Mr. Miller. After Dr. Saye died (the Complaint does not indicate when that occurred), his estate was "admitted to the partnership in his place." (*Id.* ¶ 37.)

Kimberly Clark, as the Executor of the Estate of Eddie Joe Reddick, manages the day-to-day business of the RSM Partnership (*id.* ¶ 40)—which the court understands to mean that she is responsible for receiving and distributing the royalty payments made by Covidien under the

[1] Covidien filed a redacted copy of the Reddick Saye Miller Partnership Agreement with its Answer to the Counterclaims in Reply. (Doc. No. 29-1.)

original Agreement. Although Dr. Reddick died in June 2020, the administration and ultimate closure of his estate was protracted by a string of unfortunate events described in detail in the Complaint. (*See id.* ¶¶ 41–53.) Eventually, as part of her efforts to close Dr. Reddick's estate, Clark began reaching out to Covidien in January 2024 to ask that Covidien deposit the royalty checks into an account opened in the name of the RSM Partnership instead of Dr. Reddick's personal account, into which Covidien had been depositing royalties for over ten years. (*Id.* ¶ 54.) As part of her exchange with Covidien, Clark confirmed that no assignment of the Agreement had taken place. (*Id.* ¶ 59.) The upshot of these communications was that, after being apprised that both Dr. Reddick and Dr. Saye were deceased and that the Agreement had not been properly assigned to any other person or entity, Covidien determined that "no additional royalties payments are due under the agreement." (*Id.* ¶ 60.) It ceased making payments, beginning with a payment expected in late October 2024. (*Id.* ¶ 61.)

The plaintiffs assert that the RSM Partnership is either "the partnership formerly known as Reddick Saye Consultants, with the respective successors" of the individual members "admitted in their places" (*id.* ¶ 37), or the successor to the Reddick Saye Consultants' rights under the Agreement (*id.* ¶ 38). In the alternative, the plaintiffs maintain that the successors to Reddick-Saye Consultants are the successors of each of its individual members. (*Id.* ¶ 39.) In accordance with these theories, the Complaint, first, seeks a declaration to the effect that "(a) the Agreement is a valid contract; (b) Defendant's obligation to pay royalties did not terminate on the death of Dr. Reddick, Dr. Saye, and/or Miller; and (c) that Reddick Saye Miller Partnership is entitled to receive the royalties due to the licensor under the Agreement." (*Id.* ¶ 70.) Alternatively, if the court determines that "Reddick Saye Miller Partnership is not entitled to receive royalties under the Agreement," then Kim Clark, as the Executor of the Reddick Estate, William Jeffrey Saye, as

Executor of the Saye Estate, and Lindsay Francis and Maggie Browney, as Co-Trustees of the Miller Trust, seek a declaration that "(a) the Agreement is a valid contract; and (b) Defendant's obligation to pay royalties did not terminate on the death of Dr. Reddick, Dr. Saye, and/or Miller; and (c) the Reddick Estate, the Saye Estate, and the Miller Trust are entitled to jointly receive the royalties due to the licensor under the Agreement, with the Reddick Estate being entitled to one-third (1/3), the Saye Estate being entitled to one-third (1/3), and the Miller Trust being entitled to one-third (1/3)." (*Id.* ¶ 72.)

Covidien filed an Answer to the Complaint, in which it admits that it is the successor to Dexide's rights and obligations under the Agreement and that it or its predecessors-in-interest made royalty payments and issued Form 1099s as alleged in the Complaint until mid-2024. (Doc. No. 16, Answer ¶ 4.) According to Covidien, some of the payments were made in reliance on a "mistaken[] belie[f]" that payments were due under the Agreement. (Answer ¶ 27.) It admits that it ceased making payments in October 2024 and denies that it owes any further royalty payments to the plaintiffs. (*Id.* ¶¶ 61, 64–65.)

With its Answer, Covidien also filed Counterclaims, in which it alleges that, although its predecessor-in-interest began issuing payments to Dr. Reddick individually in 2001, upon his request, neither it nor any predecessor-in-interest gave prior written consent for Dr. Reddick to assign the Agreement or any right or obligation thereunder to "any successor, assign, or any other person or entity." (Doc. No. 16, Counterclaims ¶¶ 27–28.) It also alleges that it was not informed of Dr. Reddick's 2020 death until January 3, 2024 and that the royalty payments it made between June 4, 2020 and October 2024 were "under the mistaken belief that there remained a person or entity with a valid right to receive such payments." (*Id.* ¶ 32.) It alleges that the Agreement terminated, at the latest, upon the death of Dr. Reddick. (*Id.* ¶ 33.) It seeks a declaration to the

effect that the Agreement required the valid written consent of Covidien or one of its predecessors-in-interest before Reddick-Saye Consultants could assign the Agreement, or any right or obligation thereunder, to any other person or entity, "including but not limited to Reddick-Saye Consultant's successors and assigns"; that neither it nor any predecessor-in-interest ever consented to any such assignment and, therefore, that no valid assignment of the Agreement ever took place; and that it has no ongoing obligation to make royalty payments under the Agreement. (*Id.* at Count I – Declaratory Judgment.) In addition, it seeks to recover the royalty payments it made following the death of Dr. Reddick in June 2020. (*Id.* at Count II – Unjust Enrichment; Count III – Conversion; Count IV – Money Had and Received.)

The plaintiffs/counter-defendants filed an Answer to the Counterclaims, as well as their own "Counterclaims in Reply." (Doc. No. 28.) The Counterclaims in Reply generally reiterate the allegations and claims in the Complaint, but they raise a new alternative theory of recovery: that, if the court determines that Dr. Reddick, individually, received the rights of Reddick-Saye Consultants under the Agreement, then Kimberly Clark, as executor of Dr. Reddick's estate, has standing to bring breach of contract claims on behalf of the Estate, which has not been closed. (*Id.* 25–26, ¶¶ 65–71.) Covidien filed an Answer to the Counterclaims in Reply, again denying liability under the Agreement. (Doc. No. 29.)

Following closure of the pleadings, Covidien filed its Motion for Judgment on the Pleadings. (Doc. No. 30.) Its argument in support of judgment in its favor is straight-forward. It contends that the plaintiffs' claims fail as a matter of law because they are not Reddick-Saye Consultants; they are not parties to the Royalty Agreement; and neither Covidien nor any predecessor-in-interest provided prior written consent, in accordance with the Agreement, to assignment by Reddick-Saye Consultants of any right or obligation arising under the Agreement.

Covidien also argues that, as a legal matter, it is clear that the Reddick Saye Miller Partnership is not simply a new name for the former partnership known as Reddick-Saye Consultants. As part of this argument, the defendant seeks to introduce a record from the Tennessee Secretary of State's website, showing that a corporation named Reddick-Saye Consultants, Inc. was formed in March 1991, six months before the execution of the Agreement, and that the same corporation filed articles of dissolution on March 17, 2001. (*See* Doc. No. 31-2.)

## III. ANALYSIS

### A. The Existence of Reddick-Saye Consultants, Inc.

As an initial matter, the court declines to consider the defendant's proffer of a printout from the Tennessee Secretary of State's website that purports to establish the formation and termination of a corporation known as Reddick-Saye Consultants, Inc. Nothing in the plaintiffs' pleadings, the Royalty Agreement, or any other document referred to in the Complaint hints at the existence, or relevance, of such a corporation. The Agreement was not executed by or on behalf of a corporation, and none of the payments issued by Covidien or its predecessors was issued to a corporation. The court rejects as unsupported by the record the defendant's assertion that "public records establish that Reddick-Saye Consultants was a corporation, not a partnership." (Doc. No. 30 at 11.) As the plaintiffs state, it is entirely plausible and possible that Reddick-Saye Consultants partnership existed at the same time as, and for a different purpose than, Reddick-Saye Consultants, Inc.

### B. The Role of the RSM Partnership

The plaintiffs allege that the RSM Partnership is simply the same entity as, or a successor to, the Reddick-Saye Consultants partnership. The defendant argues that, as a matter of law, it is clear that the RSM Partnership is not simply a continuation of or successor to the Reddick-Saye Consultants partnership. The court finds that material factual disputes preclude determining, at this

juncture, RSM Partnership's precise role, particularly given that neither party adequately discusses the application of the Tennessee Revised Uniform Partnership Law to the facts that are known.

### C. The Royalty Agreement

The court's primary obligation at this point is to construe the language of the Royalty Agreement between Covidien's predecessor and Reddick-Saye Consultants. Under Tennessee law, the "cardinal rule" of contract interpretation "is that courts must interpret contracts so as to ascertain and give effect to the intent of the contracting parties consistent with legal principles." *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 688 (Tenn. 2019) (collecting cases). The Tennessee Supreme Court has also emphasized "the principle that the rules used for contract interpretation 'have for their sole object to do justice between the parties, by enforcing a performance of their agreement according to the sense in which they mutually understood it at the time it was made.'" *Id.* (quoting *McNairy v. Thompson*, 33 Tenn. 141, 149 (1853) (some internal quotation marks omitted)). "Common sense must be applied to each case, rather than any technical rules of construction." *Id.* (citations omitted). "[W]hen a contract contains ambiguous or vague provisions, these provisions will be construed against the party responsible for drafting them." *Vargo v. Lincoln Brass Works, Inc.*, 115 S.W.3d 487, 492 (Tenn. Ct. App. 2003).

The Agreement's provision governing assignment and succession is set forth above. In relevant part, it provides that Reddick-Saye Consultants, as "Researcher" may not *assign* "any right or obligation arising" under the Agreement without Dexide's (Covidien's predecessor's) consent, which may be withheld for any reason in Dexide's "absolute discretion." (Agreement ¶ 10.) At the same time, however, the Agreement shall, "subject to the restrictions on *assignment* herein set forth, inure to the benefit of the *successors and assigns* of each of the parties hereto." (*Id.* (emphasis added).) Also relevant is that the Agreement expressly provides that it will terminate

only "at such time that the Product is no longer marketed by DEXIDE or a licensee of DEXIDE." (*Id.* ¶ 3.)

Based on the restriction on assignments, Covidien argues that *any* transfer, even a transfer to the plaintiffs as successors to the individual partners of the Reddick-Saye Consultants partnership, required Covidien's consent, which the plaintiffs admittedly never obtained. Quoting Merriam-Webster Dictionary's definition of *assign* ("to transfer (property) to another") (*see* Doc. No. 30 at 9), Covidien argues that ¶ 10 of the Agreement "does not distinguish between assignments to 'assignees' and transfers to 'successors.' It covers both. Any transfer of rights under the Agreement required Covidien's written consent." (*Id.*) Further, according to Covidien, the restriction on assignments also modifies the provision that the Royalty Agreement shall "inure to the benefit of the successors and assigns of each of the parties." (*Id.*) And it asserts that caselaw "confirms this reading." (*Id.*)

The only case it cites in support of its interpretation of the assignment provision, however, is *Guy Carpenter & Co. v. John B. Collins & Associates*, No. 05-1623 (JRT/FLN), 2006 WL 2502232 (D. Minn. Aug. 29, 2006), which, indeed, involved a contract with a similar provision. In that case, a business entity sued several former employees and their new employer, asserting claims for breach of contract and misappropriation of trade secrets, among others. Two of the defendants had signed a contract containing a restrictive covenant with the plaintiff's predecessor, and the issue was whether the contract was assignable. The court found, first, that restrictive covenants may be assignable under Minnesota law, "depend[ing] on the language of the contract and the circumstances of the case." *Guy Carpenter*, 2006 WL 2502232, at *4. The provision at issue there stated:

> This Agreement shall be binding upon and shall inure to the benefit of the heirs, successors and assigns of the parties; provided, however, that neither party may

> assign its duties and obligations hereunder without the consent of the other, which consent shall not be unreasonably withheld.

*Id.* at *5. The defendants signed the agreement containing that clause when they were employed by Sedgwick, which later merged with the plaintiff, Guy Carpenter. The defendants argued that they were never asked to consent, and never consented, to a transfer of their obligations under the agreement to Guy Carpenter. The plaintiff argued that, "because it merged with Sedgwick, it is a 'successor,' rather than an 'assign,'" and that it therefore "succeeded to Sedgwick's rights and duties as a matter of law, regardless of the language contained in the Sedgwick Agreement itself." *Id.*

The court construed the contract in the defendants' favor, rejecting the plaintiff's argument that only "assignments," and not transfers to successors, required consent, explaining as follows:

> The plain language of the Successors provision states that Sedgwick Agreement "shall be binding upon and shall inure to the benefit of the heirs, successors and assigns of the parties; provided, however, that neither party may assign its duties and obligations hereunder without the consent of the other, which consent shall not be unreasonably withheld." Under the plain terms of the Agreement, [the defendants'] consent was required to "assign" the Sedgwick Agreements to Carpenter.
>
> The Court also finds that the term "assign," used as a noun in the first clause, is simply part of the phrase, "heirs, successors and assigns," and that "assign," used as a verb in the second clause, is meant to refer to transfers generally, and not specifically to transfers to an assignee. This interpretation of the Successor provision respects the textual differences between the use of "assign" as a noun and a verb. Moreover, the only duty or obligation that [the defendants] could transfer to a new company—whether a successor or an assignee—would be their employment duties. Although the law recognizes differences between transfers by sale of assets and transfers by merger, practically, these formal distinctions may have little impact on an employee's job at a new company. Logically, therefore, the verb "assign" refers generally to the entire phrase "heirs, successor and assigns," rather than simply one of the three entities.

*Id.* at *6. The court also noted that its interpretation favoring the defendants was "supported by the strong policy under Minnesota state law of looking upon restrictive covenants with disfavor and

construing them narrowly" and, further, that any ambiguity regarding whether the defendants' consent was required had to be construed against the employer as the drafter of the agreement. *Id.*

This court is neither bound nor persuaded by *Guy Carpenter*, despite some linguistic similarities between the clauses at issue. First, the provision at issue in this case is not a restrictive covenant that must be construed narrowly against the employer, and there is no information in the record at this juncture regarding who drafted the Royalty Agreement.[2] Moreover, the contract language is simply not the same. Here, the Agreement expresses the parties' intent that it terminate only when Dexide, or its successors or licensees, no longer market the Product. And it expresses the intent that it "inure to the benefit of *successors and assigns* of each of the parties hereto," "subject" only "to the restrictions on assignment" set forth in the same paragraph. (Agreement ¶ 10 (emphasis added).)

And, under Tennessee law, while an "assignment" is "a transfer of property or some other right from one person (the 'assignor') to another (the 'assignee')," *Action Chiropractic Clinic, LLC v. Hyler*, 467 S.W.3d 409, 411 (Tenn. 2015) (quoting 6 Am. Jur. 2d Assignments § 1 (2008)), not every transfer is an assignment. As the Tennessee Supreme Court explained in *Action Chiropractic*,

> For an assignment to be valid, it must contain clear evidence of the intent to transfer rights, must describe the subject matter of the assignment, must be clear and unequivocal, and must be noticed to the obligor. Moreover, the intent of the assignor to transfer the right must be manifest. In determining whether the assignor has demonstrated such a manifest intent, the Court shall consider all the circumstances, including works and other conduct.

[2] While it seems apparent that the Agreement was not drafted by Drs. Reddick and Saye, it contains numerous initialed redactions, indicating that it was the product of negotiation and not simply handed to them on a take-it-or-leave-it basis.

*Id.* at 412 (internal citations and quotation marks omitted). In this case, on the record as it now stands, the court finds insufficient evidence of an assignment or any intent on the part of Reddick-Saye Consultants partnership to assign its rights under the Agreement.[3] Under the plain language of the Agreement, the Researcher could not "assign" its rights without Dexide's consent, but the "Agreement *shall* . . . inure to the benefit of the successors and assigns of each of the parties hereto," "subject to the restrictions on assignment herein set forth." (Agreement ¶ 10.) The Agreement does not contain restrictions on succession, and it is illogical and contrary to the plain language of the contract to construe it as if it did.

Specifically, while it makes sense that Dexide's consent would be required if, say, the Reddick-Saye Consultants partnership wanted to assign its rights under the Agreement to a Dexide competitor, requiring Dexide's consent for transfer to a successor or heir begs the question of why the document would even include the clause "shall inure to the benefit of the successors." No corporation, having a responsibility to maximize profits, would gratuitously grant consent to such a "transfer" if it did not have to. This is especially true given that the Agreement grants Dexide "absolute discretion" to withhold consent to an assignment, for any reason or no reason at all. In other words, reading the phrase "subject to the restrictions on assignment" to modify the phrase "inure to the benefit of the successors" would render the latter clause meaningless. Reading the Agreement as a whole, the court finds that transfers to legal successors does not require Dexide's—or Covidien's—consent and that the clear intent of the parties, as expressed in the Agreement, is

[3] What is unclear is whether the individual partners might have transferred their interest in the *partnership*. *See* Tenn. Code Ann. § 61-5-503(a) (permitting the "transfer, in whole or in part, of a partner's transferable interest in the partnership," thus giving the transferee the right to "receive . . . distributions to which the transferor would otherwise be entitled").

that royalties on sales of the Product will inure to the benefit of the Researcher's successors or heirs for as long as the Product continues to be marketed.

Consequently, Covidien is not entitled to judgment as a matter of law. Moreover, while there are questions of fact that may never be resolved regarding the purpose, duration, and dissolution of the Reddick-Saye Consultants partnership (given the death of the three partners),[4] the heirs' and legal successors' decision to enter into a separate agreement regarding the distribution of those royalties is, quite simply, their own business rather than Covidien's, making a determination of whether the RSM Partnership is a continuation of the Reddick-Saye Consultants partnership somewhat beside the point.

Additionally and alternatively, there are unresolved questions of fact regarding Covidien's predecessor's decision to start sending checks to Dr. Reddick individually. Irrespective of the "prior written consent" clause, Covidien's predecessor may be deemed to have implicitly agreed to a transfer of the partnership's right to royalty payments to Dr. Reddick individually, for him to distribute pursuant to a separate agreement with the other partners (or former partners) of the Reddick-Saye Consultants partnership. Under Tennessee law, "[a] party's agreement to a modification need not be express, but may be implied from a course of conduct; this is true even where the agreement expressly specifies, as in this case, that the parties may only modify the agreement in writing." *Lancaster v. Ferrell Paving, Inc.*, 397 S.W.3d 606, 611–12 (Tenn. Ct. App. 2011) (citation omitted). If this is the case, then Dr. Reddick's heirs would be entitled to continue to receive the royalty payments and to distribute them however they see fit.

[4] If, for instance, this very informal partnership was informally dissolved as of 2001 (when Covidien's predecessor began directing cover letters and checks to Dr. Reddick individually, which Covidien suggests was in accordance with Dr. Reddick's request), then the partnership would be covered by the Tennessee Uniform Partnership Act, rather than the *Revised* Uniform Partnership Act, which took effect in 2002. *See* Tenn. Code Ann. § § 61-1-1206.

Regardless, Covidien is not entitled under the Agreement to continue to benefit from the sale of the Product without paying royalties to the successors of the Reddick-Saye Consultants partnership, whoever they are. And it is not entitled to judgment as a matter of law.

## IV. CONCLUSION

Covidien's Motion for Judgment on the Pleadings (Doc. No. 30) will, for the reasons set forth herein, be denied. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge